## Case No. 7,575.

### The JULIA.

[1 Gall. 594.] 1

Circuit Court, D. Massachusetts. May Term, 1813.2

PRIZE—INTERCOURSE WITH ENEMY—LICENSE.

1. A license or protection from the enemy, found on board an American vessel, on a voyage to a neutral port in alliance with the enemy, the terms of which were such, as to prove an intercourse with the enemy and a direct subserviency to his interests. was held to subject the vessel and cargo to confiscation, as prize of war.

[Cited in Maisonnaire v. Keating. Case No. 8,978; Caldwell v. Express Co., Id. 2,303.]

[See note at end of case.]

[Cited in Coolidge v. Inglee, 13 Mass. 41; Kershaw v. Kelsey, 100 Mass. 566, 571.]

2. Semble, that such a license or protection, without any such peculiar terms, would be illegal, and subject the property to confiscation as prize.

3. Important documents. which were the cause of capture, having been surreptitiously taken from the possession of the prize-master; exact copies taken by him and verified by his affidavit, were, under the circumstances, admitted as good evidence.

[Appeal from the district court of the United States, for the district of Massachusetts.]

In admiralty.

STORY, Circuit Justice. The Julia and cargo were captured as prize by the United States frigate Chesapeake, commanded by Captain Evans, on the 31st of December, 1812. From the preparatory evidence and documents, it appears that she sailed from Baltimore on or about the 15th of October, 1812, bound on a voyage to Lisbon, with a cargo of corn, bread, and flour; and the capture took place on the return voyage to the United States. The vessel and cargo were documented as American, and as owned by the claimants, who are American citizens. The vessel had on board sundry documents of protection from British agents, w nich were delivered up to the captors, and, together with the other ship's papers, were put on board of the prize, in the custody of the prize-master. And these documents were the unquestionable cause of the capture. It appears that the American master and crew were left on board of the prize, and during the subsequent voyage to the United States, these British documents were taken from the custody of the prize-master surreptitiously, and without his knowledge as to the time or manner. He alleges expressly that they were stolen; and this allegation seems admitted by the master in a supplementary affidavit, who, however, denies any knowledge or connection in the transaction. The prize-master took exact copies of these documents for the purpose of sending them to the secretary of the navy, which copies have been produced in court and verified by his affidavit—all the other

---

1 [Reported by John Gallison, Esq.]

2 [Affirmed in 8 Cranch (12 U. S.) 181.]

original documents have been faithfully produced.

Upon the examination of the master [Luce] upon the standing interrogatories on the 18th of February, 1812, although there are several interrogatories, and particularly the 16th and 27th, which point directly to the subject matter, he did not state the existence of any British document, passport, safeguard or protection; and what is quite unaccountable, he expressly declared that he knew not upon what pretence nor for what reason the vessel and cargo were captured. It was not until after the time assigned for the trial, and, on the 8th of March, 1813, that the master by a supplementary affidavit (which was admitted through great indulgence, and contrary to the general practice of the prize courts) attempted to explain his omission and to vindicate his misconduct. The apology is equally weak and futile. At the time when these examinations were taken, the interrogatories had been drawn up with care and deliberation. The commissioners were present to explain to the understanding of every man, intent on truth, the meaning of any question which might appear obscure. The master was a part owner of the vessel and cargo, and the regular depositary of all the papers connected with the voyage. It is utterly incredible, that he should not recollect on his examination the existence of these British documents. They were put on board for the special safeguard and security of the vessel and cargo. Indeed, independent of them, the risk of capture would have been imminent. A master can never be admitted to be heard in a prize court to aver his ignorance or forgetfulness of the documents of his ship. It is his duty to know what they are, and he cannot be believed ignorant of their contents without overthrowing all the presumptions, which govern in prize proceedings. Looking to the whole conduct of the master, it seems to be irreconcilable with the rules of morality and fair dealing, and I have great difficulty in exempting him from the imputation of being guilty of a wilful suppression of the truth.

At the hearing, a preliminary objection was taken to the introduction of the copies of the British documents, upon the ground that the originals, as the best evidence, ought to be produced. The rule undoubtedly applies when the originals are in existence and in the possession or control of the party. The extraordinary disappearance of these important papers, under the circumstances of this case, I can have little doubt, was occasioned by a fraudulent subtraction. There is no reason to impute this subtraction to the prizemaster. The documents were to him a very important protection. They constituted the avowed reason of the capture, as the mate and some of the seamen testify. It is true, that the master has declared, that he knew not the pretence of capture—but it can hardly be believed, that he could be ignorant of a fact, which so materially affected his interest. I feel myself bound to make very unfavorable inferences against him; and if, in odium spoliatoris, I impute the subtraction to some person on board connected with the voyage, and in the confidence of the master, it is measuring out no injustice to one, who appears to deem mis-statements and concealments no violent breach of good faith. I shall therefore admit the copies, verified as they are, as good evidence in these proceedings; and I will add, that if a single material fact in favor of the claimants had depended upon the supplementary affidavit of the master, I should have felt myself compelled to repudiate it, in order to vindicate the regularity of prize proceedings, and suppress the efforts of fraud to derive benefit from after thoughts and contrivances. These remarks are not made without regret, but public duty requires that manifest aberrations from moral propriety should not receive shelter in this court.

Having disposed of this preliminary objection, I now proceed to consider the two questions, which have been so ably discussed in this case. 1. Whether the use of an enemy's license or protection on a voyage to a neutral country in alliance with the enemy, be illegal, so as to affect the property with confiscation.[3] 2. If not, whether the terms of the present license distinguish this case unfavorably from the general principle.

The British documents which were on board, and which for conciseness I have termed a license, are as follows:—

"(Seal.) By Herbert Sawyer, Esq., Vice Admiral of the Blue, and Commander in Chief of his Majesty's ships and vessels employed and to be employed in the river St. Lawrence, along the coast of Nova Scotia, the islands of Anticosti, Madelaine, and St. John, and Cape Breton, and the Bay of Fundy, and at and about the island of Bermuda, or Somers Islands, &c. &c. &c.

"Whereas, Mr. Andrew Allen, his majesty's consul at Boston, has recommended to me Mr. Robert Elwell, a merchant of that place, and well inclined towards the British interest, who is desirous of sending provisions to Spain and Portugal for the use of the allied armies in the Peninsular, and whereas I think it fit and necessary, that encouragement and protection should be afforded him in so doing—These are therefore to require and direct all captains and commanders of his majesty's ships and vessels of war, which may fall in with any American, or other vessel bearing a neutral flag, laden with flour, bread, corn and peas, or any other species of dry provisions, bound from America to Spain or Portugal, and having this protection on board, to suffer her to proceed without unnecessary obstruction or

---

[3] See The Hiram, 8 Cranch [12 U. S.] 444, 1 Wheat. [14 U. S.] 440; The Ariadne, 2 Wheat. [15 U. S.] 143.

detention in her voyage, provided she shall appear to be steering a due course for those countries, and it being understood, this is only to be in force for one voyage, and within six months from the date hereof.

"Given under my hand and seal on board his majesty's ship Centurion, at Halifax, this fourth day of August, one thousand eight hundred ——. H. Sawyer, Vice Admiral. "By command of the vice admiral, William Ayres."

"To the Commanders of his Majesty's Ships of War, or of Private Armed Ships, Belonging to Subjects of His Majesty: Whereas, from the consideration of the great importance of continuing a regular supply of flour and other dried provisions to the allied armies in Spain and Portugal, it has been deemed expedient by his majesty's government, that notwithstanding the hostilities now existing between Great Britain and the United States, every degree of encouragement and protection should be given to American vessels laden with flour, and other dry provisions. and bona fide bound to Spain or Portugal. And whereas in furtherance of these views of his majesty's government, Herbert Sawyer, Esqr., vice admiral and commander in chief of the Halifax station, has addressed to me a letter under the date of the 5th of August, 1812, (a copy whereof is hereunto annexed) wherein I am instructed to furnish a copy of his letter certified under my consular seal, to every American vessel so laden and bound, destined to serve as a perfect safeguard and protection of such vessel in the prosecution of her voyage. Now therefore, in obedience to these instructions, I have granted to the American brig Julia, Tristan Luce master, of 159 tons burthen, now lying in the harbor of Boston and bound to Baltimore, for the purpose of taking in a cargo of flour and corn, and proceeding thence to a port in Spain or Portugal, not under French domination, the annexed documents, requesting all officers, commanding his majesty's ships of war, or of private armed ships, belonging to subjects of his majesty, to give to the said vessel all due assistance and protection in the prosecution of her voyage to Spain and Portugal, and on her return thence to her port of original departure. laden with salt or with specie, to the nett amount of her outward cargo, or in ballast only.

"(Consular Seal.) Given under my hand and seal of office, at Boston, this 18th day of September, 1812. Andrew Allen, Jun., His Majesty's Consul."

"(Wafer.)     Office of his Britannic Majesty's Consul.

"I, Andrew Allen, Jun. his Britannic majesty's consul for the states of Massachusetts, New-Hampshire, Rhode Island, and Connecticut, hereby certify. that the annexed paper is a true copy of a letter addressed to me by Herbert Sawyer, Esq. vice admiral

and commander on the Halifax station. Given, &c.

"'(Consular Seal.)     Andrew Allen, Jun."

(Copy.) "His Majesty's Ship Centurion at Halifax, the 5th of August, 1812.

"Sir: I have fully considered that part of your letter of the eighteenth ultimo, which relates to the means of insuring a constant supply of flour and other dried provisions to the allied armies in Spain and Portugal, and to the West India Islands, and being aware of the importance of the subject, concur in the proposition you have made; I shall, therefore, give directions to the commander of his majesty's squadron under my command, not to molest American vessels unarmed and so laden, bona fide bound to British, Portugese, or Spanish ports, whose papers shall be accompanied with a certified copy of this letter under the consular seal. I have the honor to be, &c. H. Sawyer, Vice Admiral.

"To Andrew Allen, Esq., • "His Majesty's Consul, Boston."

In approaching the more general question, which has been raised in this case, I am free to acknowledge that I feel no inconsiderable diffidence, both from the importance of the question, and the different opinions, which eminent jurists have entertained respecting it. Nor am I insensible also, that it has entered somewhat into political discussions, and awakened the applause and zeal of some, and the denunciations of others, considered merely as a subject of national policy, and not of legal investigation. It has now become my duty to examine it, and whatever may be my opinion, I feel a consolation that it is in the power of a higher tribunal, to revise my errors, and award ample justice to the parties.

At the threshold of this inquiry, I lay it down as a fundamental proposition, that, strictly speaking, in war all intercourse between the subjects and citizens of the belligerent countries is illegal, unless sanctioned by the authority of the government, or in the exercise of the rights of humanity. I am aware that the proposition is usually laid down in more restricted terms by elementary writers, and is confined to commercial intercourse. Bynkershoek says: "Ex natura belli commercia inter hostes cessare non est dubitandum. Quamvis nulla specialis fit commercium prohibitio, ipso tamen jure belli commercia ipsa vetita, ipsae indictiones bellorum satis declarant." [Bynk. Q. J. P. bk. 1, c. 3.][4] And yet it seems not difficult to perceive, that his reasoning extends to every species of intercourse. Valin in his commentary on the French ordinance, speaking of the reason of requiring the name and domicil of the assured in a policy, says: "Est encore de connoitre en temps de guerre, si. malgre l'interdiction de commerce qu' emporte toujours

---

[4] [From 8 Cranch (12 U. S.) 193.]

toute declaration de guerre, les sujets du roi ne font point commerce avec les ennemis de l' etat, ou avec des amis ou alliés, par 'l' interposition desquels on ferait passer aux ennemis des munitions de guerre et de bouche, ou d' autres effets prohibes; car tout cela etant defendu comme prejudiciable a l' etat, serait sujet à confiscation, et à etre declaré de bonne prise." Lib. 1, tit. 6, art. 3, p. 31. In another place, adverting to a case of neutral, allied and French property, on board an enemy ship, &c. he declares it subject to confiscation, because, "c'est favoriser le commerce de l'ennemi et faciliter le transport de ses denrées et marchandises, ce qui ne peut convenir aux traitées d'alliance on de neutralité encore moins aux sujets du roi, auxquels toute communication avec l'ennemi est etroitement defendu, sur peine meme de la vie." Lib. 3, p. 253, tit. 9, art. 7, and Valin, Traite des Prises, p. 62, § 5, c. 5.

From this last expression it seems clear, that Valin did not understand the interdiction, as limited to mere commercial intercourse. In the elaborate judgment of Sir William Scott, in The Hoop, 1 C. Rob. Adm. 196, the illegality of commercial intercourse is fully established as a doctrine of national law; but it does not appear, that the case before him required a more extended examination of the subject. The black book of the admiralty contains an article, which deems every intercourse with the public enemy an indictable offense. This article, which is supposed to be as old as the reign of Edward 3d, directs the grand inquests, "soit enquis de tous ceux qui entrecommunent vendent ou achatent avec aucuns des ennemis de notre seigneur le roy sans license especiale du roy ou de son amiral." In The Jonge Pieter, 4 C. Rob. Adm. 79, Sir W. Scott lays down the rule in terms equally broad. He says: "Without the license of the government, no communication, direct or indirect, can be carried on with the enemy."

But independent of all authority, it would seem a necessary result of a state of war, to suspend all negotiations and intercourse between the subjects of the belligerent nations. By the war, every subject is placed in hostility to the adverse party. He is bound by every effort of his own to assist his own government, and to counteract the measures of its enemy. Every aid therefore by personal communication, or by other intercourse, which shall take off the pressure of the war, or foster the resources, or increase the comforts of the public enemy, is strictly inhibited. No contract is considered as valid between enemies, at least so far as to give them a remedy in the courts of either government, and they have, in the language of the civil law, no ability to sustain a persona standi in judicio.[5] The ground upon which a trading with the enemy is prohibited, is not the crim-

inal intentions of the parties engaged in it, or the direct and immediate injury to the state. The principle is extracted from a more enlarged policy, which looks to the general interests of the nation, which may be sacrificed under the temptation of unlimited intercourse, or sold by the cupidity of corrupted avarice. In the language of Sir William Scott, I would ask: "Who can be insensible to the consequences that might follow, if every person in time of war had a right to carry on a commercial intercourse with the enemy, and under color of that had the means of carrying on any other species of intercourse, he might think fit? The inconvenience to the public might be extreme; and where is the inconvenience on the other side, that the merchant should be compelled, in such a situation of the two countries, to carry on his trade between them, if necessary, under the eye and control of the government, charged with the care of the public safety?" Nor is there any difference between a direct intercourse with the enemy country, and an intercourse through the medium of a neutral port. The latter is as strictly prohibited as the former. The Jonge Pieter, 4 C. Rob. Adm. 79.

It is argued, that the cases of trading with the enemy are not applicable; because there is no evidence of actual commerce, and an irresistible presumption arises from the nature of the voyage to a neutral port, that no such trade is intended. If I am right in the position, that all intercourse, which humanity or necessity does not require, is prohibited, it will not be very material to decide, whether there be a technical commerce or not. But is it clear beyond all doubt, that no inference can arise of an actual commerce? The license is issued by the agents of the British government, and I must presume, under its authority. It is sold (as it is stated) in the market, and if it be a valuable acquisition, the price must be proportionate. If such licenses be an article of sale, I beg to know in what respect they can be distinguished from the sale of merchandize? If purchased directly of the British government, would it not be a traffic with an enemy? If purchased indirectly, can it change the nature of the transaction? It has been said, that if purchased of a neutral, the trade in licenses is no more illegal, than the purchase of goods of the enemy fabric bona fide conveyed to neutrals. Perhaps this may, under circumstances, be correct. But I do not understand, that the purchase of goods of enemy manufacture, and avowedly belonging to an enemy, is legalized by the mere fact of the sale being made in a neutral port. The goods must have become incorporated into the general stock of neutral trade, before a belligerent can lawfully become the purchaser. If such licenses be a legitimate arti-

---

[5] Vide 13 Ves. 71. That a contract made with an enemy pending the war is void. S. P. for Brian, J., 19 Edw. IV., 6, cited Theo. Dig.

lib. 1, c. 6, § 21. Vide The Santa Cruz. 1 C. Rob. Adm. 50. 76: Antoine v. Morshead, 6 Taunt. 237, 1 Marsh. C. P. 558.

cle of sale, will they not enable the British government to raise a revenue from our citizens, and thereby add to their resources of war? Admit however, that they are not so sold, but are a measure of policy, adopted by Great Britain to further her own interests and insure a constant supply of the necessaries of life either in or through neutral countries. Can it be asserted, that an American citizen is wholly blameless, who enters into stipulations and engagements to effect these purposes? · Is not the enemy thereby relieved from the pressure of the war, and enabled to wage it more successfully against other branches of the same commerce, not protected by this indulgence? It is said, that the case of a personal license is not distinguishable from a general order of council, authorizing and protecting all trade to a neutral country. In my judgment, they are very distinguishable. The first presupposes a personal communication with the enemy, and an avowed intention of furthering his objects, to the exclusion of the general trade by other merchants to the same country. It has a direct tendency to prevent such general trade, and relieves the enemy from the necessity of resorting to a general order of protection. It contaminates the commercial enterprises of the favored individual with purposes not reconcilable with the general policy of his country; exposes him to extraordinary temptations to succor the enemy by intelligence, and separates him from the general character of his country, by clothing him with all the effective interests of a neutral. Now, these are some of the leading principles, upon which a trade with the enemy has been adjudged illegal by the law of nations. On the other hand, a general order opens the whole trade of the neutral country to every merchant. It presupposes no incorporation in enemy interests. It enables the whole mercantile enterprise of the country to engage upon equal terms in the traffic, and it separates no individual from the general national character. It relaxes the rigor of war, not only in that particular trade, but collaterally opens a path to other commerce. There is all the difference between the cases, that there is between an active personal co-operation in the measures of the enemy, and the merely accidental aid afforded by the pursuit of a fair and legitimate commerce.

In the purchase or gratuity of a license for trade, there is an implied agreement, that the party shall not employ it to the injury of the grantor; that he shall conduct himself in a perfectly neutral manner, and avoid every hostile conduct. I say there is an implied agreement to this effect in the very terms and nature of the engagement. I am warranted in declaring this from the uniform construction put by Great Britain on the conduct of her own subjects acting under licenses. Can an American citizen be permitted, in this manner, to carve out for himself a neutrality on the ocean, when his country is at war? Can he justify himself in refusing to aid his countrymen, who have fallen into the hands of the enemy on the ocean, or decline their rescue? Can he withdraw his personal services, when the necessities of the nation require them? Can an engagement be legal, which imposes upon him the temptation or necessity of deeming his personal interest at variance with the legitimate objects of the government? I confess, that I am slow to believe, that the principles of national law, which formerly considered the lives and properties of all enemies as liable to the arbitrary disposal of their adversary, are so far relaxed, that a part of the people may claim to be at peace, while the residue are involved in the desolations of war. Before I shall believe the doctrine, it must be taught me by the highest tribunal of the nation, in whose superior wisdom and sagacity I shall most cheerfully repose. It has been said, that no case of condemnation can be found on account of the use of an enemy license. Admitting the fact, I am not disposed to yield to the inference, that it is therefore lawful. It is one of the many novel questions, which may be presumed to arise out of the extraordinary state of the world. The silence of adjudged cases proves nothing either way. It may well admit of opposite interpretations.

The case of The Vrow Elizabeth, 5 C. Rob. Adm. 2, has been cited by the captors in support of the more general doctrine. It was a case, where the ship had the flag and pass and documents of an enemy's ship; and the court held, that the owner was bound by the assumed character. There is no similarity in the case before the court; the ship and cargo were documented as American, and not as British property. As little will The Clarissa, 5 C. Rob. Adm. 4, cited on the other side, apply. It was at most but a license given by the Dutch government, allowing a neutral to trade within its own colony. In all other respects the ship and property were avowedly neutral; and unless so far as the English doctrines, as to the colonial trade, could apply, there was nothing illegal or improper in waiving any municipal regulations of colonial monopoly in favor of a neutral. There was nothing, which compromitted the allegiance or touched the interests of the neutral country. If, however, this license had conferred on the neutral the special privileges of a Dutch merchant, or had facilitated the Dutch policy in warding off the pressure of the war, it would probably have received a very different determination.[6] We all know that there are many acts, which inflict upon neutrals the penalty of confiscation, from the subserviency, which they are supposed to indicate, to enemy

---

[6] See The Vreede Scholtys, 5 C. Rob. Adm. 5, note a; The Rendsborg, 4 C. Rob. Adm. 121.

interests—the carrying of enemy despatches —the transportation of military persons, and the adopting of the coasting trade of the enemy. The ground of these decisions is the voluntary interposition of the party to further the views and interests of one belligerent at the expense of the other; and I cannot doubt that the Clarissa would have shared the general fate, but from some circumstance of peculiar exemption.

By the prize code of Louis 14th, (which I quote the more readily, because it is in general a compilation of prize law, as recognized among civilized nations,) it is a sufficient ground of condemnation, that a vessel bears commissions from two different states. Valin (Traite des Prises, 53) says: "A l'egard du vaisseau ou se trouverent des commissions de deux differens princes ou etats, il est egalement juste qu'il soit declare de bonne prise, soit parce qu'il ne peut avoir pris ces commissions que dans un esprit de fraude et de surprise, furent elles toutes deux de princes amis du neutre; soit parce qu'il ne peut arborer le pavillon de l'un en consequence de sa commissions, sans faire injure a l'autre. Ceci au reste regarde les Francais, comme les etrangers." In what consists the substantive difference between navigation under the commissions of our own and also of another sovereign, and navigating under the protection of the passports of such sovereign, which confer or compel a neutral character, Valin, in another place (sur l'Ordinance, lib. 3, p. 241, tit. 9, art. 4) declares: "Si sur un navire Francais il y a une commission d'une prince etranger avec celle de France, il sera de bonne prise, quoiqu'il n'ait arbore que le pavillon Francais." It is true, that he just before observes, "que ce circonstance de deux conges ou passeports, ou de deux connoissements, dont l'un est de France et l'autre d'un pays ennemi, ne suffit pas seule pour faire declarer le navire ennemi de bonne prise, et que cela doit dependre des circonstances capable de faire decouvrir sa veritable destination." But Valin is referring to the case of an enemy ship having a passport of trade from the sovereign of France. I infer from the language of Valin, that a French ship sailing under the passport, conge, or license of its enemy, without the authority of its own sovereign, would have been lawful prize.

This leads me to another consideration, and that is, that the existence and employment of such a license affords a strong presumption of concealed enemy interests, or at least of ultimate destination for enemy use. It is inconceivable, that any government should allow its protection to an enemy trade, merely out of favor to a neutral nation, or to an ally, or to its enemy. Its own particular and special interests will govern its policy, and the quid pro quo must materially enter into every such relaxation of belligerent rights. It is therefore a fair

inference, either that its subjects partake of the trade under cover, or that the property, or some portion of the profits, finds its way into the channel of the public interests.

It has been argued, that the use of false or simulated papers is allowable in war, as a stratagem to deceive the enemy and elude his vigilance. However this may be, it certainly cannot authorize the use of real papers of a hostile character, to carry into effect the avowed purpose of the enemy. We may be allowed to deceive our enemy, but we can never be allowed to set up, as such a deception, a concert in his own measures, for the very purposes he has prescribed.

An allusion has been made to the passports or safe conducts granted in former times to the fishing vessels of enemies, and it has been argued, that such passports or safe conducts have never been supposed to induce the penalty of confiscation. This will at once be conceded, as to the belligerent nation, who granted these indulgences. But as to the other nation, where such passports were not guaranteed by treaty or mutual pacts, I have no authority to lead me to an accurate decision. The French ordinance of 1543 authorized the admiral to make fishing truces with the enemy, and where no such truces were made, to deliver to the subjects of the enemy safe conducts for fishing, upon the same stipulations, as they should be delivered to French subjects by the enemy. This, therefore, was an authority to be exercised only in cases of reciprocity, and it seems to have been abolished from the manifest inconveniences, which attended the practice. Valin sur l'Ord. lib. 1, pp. 689, 690. I do not think that any argument in favor of the validity of the present license, (unrecognized as it is by our government,) can be drawn from these ancient examples as to fisheries.

It has been argued, that the voyage was lawful to a neutral port, and the mere use of a license cannot cover a lawful voyage with the taint of illegality. This, however, is assuming the very point in controversy. It is not universally true, that a destination to a neutral port gives a bona fide character to the voyage. If the property be ultimately destined for an enemy port, or an enemy use, it is clear that the interposition of a neutral port will not save it from condemnation. The Jonge Pieter, 4 C. Rob. Adm. 79. Suppose, in the present case, the vessel and cargo had been destined to Lisbon, for the express use of the British fleet there, could there be a doubt, that it would have been a direct trade with the enemy? Whether the voyage, therefore, be legal or not, depends not merely upon the destination, but the ultimate application of the property or the ascertained intentions of the party. A contract to carry provisions to St. Bartholomews, for the ultimate supply of the British West India islands, would be just as much an infringement of the law of war, as a contract for a direct transportation.

On the whole, I adopt, as a salutary maxim

of war, the doctrine of Bynkershoek, "vetatur quoquo modo hostium utilitati consulere." It is unlawful in any manner to lend assistance to the enemy, by attaching ourselves to his policy, sailing under his protection, facilitating his supplies, and separating ourselves from the common character of our country. I am aware that the opinion, which I have formed, as to the general nature of licenses, is encountered by the decisions of learned judges, for whom I entertain every possible respect. This circumstance alone, independent of the novelty and importance of the question, would awaken in my own mind an unusual hesitation, as to the correctness of my own opinion. But after much reflection upon the subject, I have not been able to find sufficient grounds to yield it; and my duty requires that whatsoever may be its imperfections, my own judgment should be pronounced to the parties. I am glad, however, to be relieved from the painful necessity of deciding the more general question by the peculiar terms of the present license, which I consider as affording irrefragable proof of an illicit intercourse with the enemy, and a direct contract to transport the cargo for the use of the British armies in Spain and Portugal. The very preamble to the license of Admiral Sawyer shows this in a most explicit manner, and discloses facts, which it is no harshness to declare are not very honorable to the principles or the character of the parties.

It has been attempted to distinguish the present claimants, from Mr. Elwell, to whom the original license was granted. It could hardly have been expected, that such an attempt would be successful. The assignees cannot place their derivative title upon a better footing than the original party. They must be considered as entering into the views, and contracting to effectuate the intentions, of the latter; and, at all events, the illegality of the employment of the license attaches indissolubly to their conduct. If it were material, however, it might deserve consideration, how far an actual assignment is shown in the case. It rests on the affidavit of one of the claimants, and on the mere face of papers, which carry no very decisive character, and are quite reconcilable with concealed interests in other persons, as the records of prize courts abundantly show. However, I only glance at this subject, as it in no degree enters into the ingredients of my judgment.

A very bold proposition was at one time advanced in the argument by the claimant's counsel, that if this cargo had been actually destined to Portugal, for the use of the allied armies of Great Britain and Portugal, or even for the use of the British army, it would not be an offense against the laws of war. In the sequel, if I rightly understand, this proposition, in this alarming extent, was not contended for; and certainly it is utterly untenable upon the principles of national law. But it was insisted on, that the British armies in Portugal and Spain were to be considered as incorporated into the armies of those kingdoms, and as not holding the British character. If I could so far forget the public facts, of which sitting in a prize court I am bound to take notice, there is sufficient in the papers before me to prove the contrary of this suggestion. In Admiral Sawyer's license and Mr. Allen's certificate, they are expressly called the allied armies; thereby plainly admitting a separate character and organization; and so in point of fact we all know it to be; if, indeed, the British character be not predominant throughout these countries. I reject the distinction, therefore, as utterly insupportable in point of fact.

It has been further argued, that if the conduct be illegal, it is but a personal misdemeanor in no degree affecting the vessel and cargo; and, at all events, that the illegality was extinguished by the termination of the outward voyage. The principles of law afford no countenance to either part of the proposition. If the property be engaged in an illegal traffic with the enemy, or even in an attempt to trade, it is liable to confiscation, as well on the return as on the outward voyage; and it may be assumed as a proposition liable to few, if any exceptions, that the property, which is rendered auxiliary or subservient to enemy interests, becomes tainted with forfeiture.

I cannot but remark, that the license in this case, issued within our own territory by an agent of the British government, carries with it a peculiarly obnoxious character. This circumstance, which is founded on an assumption of consular authority, that ought to have ceased with the war, affords the strongest evidence of improper intercourse. The public dangers, to which it must unavoidably lead, by fostering interests within the bosom of the country against the measures of the government, and the breach of faith, which it imports, in a public functionary receiving the protection of the government, can never be lost sight of in a tribunal of justice.[7] I forbear to dwell further on this delicate subject.

Upon the whole, I consider the property engaged in this transaction, as stamped with the hostile character, and I entirely concur in the decision of the district judge, which pronounced it subject to condemnation.

Decree affirmed.

[7] Vide The Planter's Wensch, 5 C. Rob. Adm. 22.

This judgment was affirmed on appeal by the claimants in the supreme court, expressly for the reasons and upon the principles stated in this opinion, 8 Cranch [12 U. S.] 181 [Mr. Justice Story delivering an opinion in which he held "that the sailing on a voyage under the license and passport of protection of the enemy, in furtherance of his views or interests, constitute such an act of illegality as subjects the ship and cargo to confiscation as prize of war"].